**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Farnam Companies, Inc., an Arizona Corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>Stabar Enterprises, Inc., a Delaware Corporation,<br><br>        Defendant. | No. CV 03-503-PHX-NVW<br><br>**ORDER** |

The court has considered, in regard the motion by defendant, Stabar's Motion For Summary Judgment (doc. # 160-1) ("Stabar Motion"), Statement Of Facts In Support Of Stabar's Motion For Summary Judgment (doc. # 160-2) ("Stabar Motion SOF"), Declaration Of Martin J. Siegel (doc. # 160-3) ("Stabar Motion SOF Ex."), Farnam's Response To Stabar's Motion For Summary Judgment (doc. # 172-1) ("Farnam Response"), Controverting Statement Of Facts In Support Of Farnam's Response To Stabar's Motion For Summary Judgment (doc. # 172-2) ("Farnam CSOF"), Exhibit List Re Controverting Statement Of Facts In Support Of Farnam's Response To Stabar's Motion For Summary Judgment (doc. # 173) ("Farnam CSOF Ex."), Stabar's Reply In Support Of Its Motion For Summary Judgment (doc. # 175) ("Stabar Reply"), and Supplemental Statement Of Facts In Support Of Stabar's Motion For Summary Judgment (doc. # 176) ("Stabar Reply SSOF").  In regard

1   plaintiff's motion the court has considered Farnam's Motion For Summary Judgment (doc.

2   # 155-1) ("Farnam Motion"), Statement Of Facts In Support Of Farnam's Motion For

3   Summary Judgment (doc. # 155-2) ("Farnam Motion SOF"), Exhibit List Re Farnam's

4   Statement Of Facts In Support Of Its Motion For Summary Judgment (doc. # 167) ("Farnam

5   Motion SOF Ex."), Stabar's Response To Farnam's Motion For Summary Judgment (doc. #

6   170) ("Stabar Response"), Statement Of Facts In Support Of Stabar's Response To Farnam's

7   Motion For Summary Judgment (doc. # 169) ("Stabar Response SOF"), Declaration Of

8   Martin J. Siegel (in support of Stabar's Response) (doc. # 171) ("Stabar Response SOF Ex."),

9   Reply In Support Of Farnam's Motion For Summary Judgment (doc. # 177-1) ("Farnam

10  Reply"), Supplemental Statement Of Facts In Support Of Farnam's Reply In Support Of

11  Farnam's Motion For Summary Judgment (doc. # 177-2) ("Farnam Reply SOF"), and Exhibit

12  List To Supplemental Statement Of Facts In Support Of Farnam's Reply In Support Of

13  Farnam's Motion For Summary Judgment (doc. # 177-3) ("Farnam Reply SOF Ex.").

14  　　　　Plaintiff Farnam Companies, Inc. ("Farnam") brought this action against Stabar

15  Enterprises, Inc. ("Stabar") after Stabar terminated the parties' license agreement ("License

16  Agreement") on November 24, 2002.  (Stabar Motion at 1.)  Farnam sought inter alia

17  damages for Stabar's alleged breach of the License Agreement and a declaration that Farnam

18  had not itself breached the License Agreement.  (doc. # 1 at ¶¶ 23-33.)  Stabar

19  counterclaimed inter alia for breach of the License Agreement, seeking damages and alleging

20  that Farnam's failure to fully perform under the agreement made Stabar's termination

21  permissible.  Both parties now move for summary judgment on some of Farnam's claims.

22  **I.     Background**

23  　　　　Stabar is a Delaware corporation that develops, distributes, markets and licenses pet

24  and equine products under the "Mrs. Allen's®" brand.  (doc. # 46 at ¶ 6.)  Chief among

25  Stabar's products is a line of pet dietary supplements marketed as reducing shedding and sold

26  under the name "Shed-Stop®" ("Shed-Stop").  (doc. # 46 at ¶¶ 4, 7.)  The composition of

27  these supplements is an important trade secret for Stabar (the "formula") and was the subject

28

1    of Stabar's patent # 5965153, (doc. # 46 at ¶ 6), although the patent did not disclose the entire

2    formula.  (Stabar Response at 15.)

3         Farnam is an Arizona corporation that develops, manufactures, markets and distributes

4    animal health care products.  (Farnam Motion at 1.)  In October of 1999, Farnam, through

5    its consultant, contacted Stabar's management seeking to form a business relationship

6    between Farnam and Stabar.  (Farnam Motion at 2.)  The central dispute in this case is

7    whether under the parties' subsequent agreements, Stabar was required to divulge the formula

8    to Farnam.

9         The parties entered the License Agreement on March 17, 2000, and at the same time

10   a confidentiality agreement ("Confidentiality Agreement").  (Stabar Motion SOF Ex. 1 at 1;

11   Stabar Motion SOF at ¶ 8.)  The Confidentiality Agreement was incorporated by reference

12   into and made supreme over the License Agreement, which stated:  "Nothing herein shall be

13   deemed to limit or alter the rights and obligations of FARNAM and/or STABAR under the

14   CONFIDENTIALITY  AGREEMENT."   (Stabar  Motion  SOF  Ex.  1  at  22.)   In  the

15   Confidentiality Agreement Stabar agreed to disclose some but not all of its "confidential

16   information" to Farnam.  (Stabar Motion SOF Ex. 1 at Ex. G at 1.)  Stabar's "confidential

17   information" was defined broadly in the Confidentiality Agreement and specifically included

18   the formula.  (Stabar Motion SOF Ex. 1 at Ex. G at 2.)

19        The  License  Agreement,  for  its  part,  granted  to  Farnam  certain  marketing,

20   manufacturing, sales and distribution rights with respect to Stabar's products, stating in

21   relevant part:

22                    (a) STABAR grants to FARNAM, for the period of seven
                 (7) years from the EFFECTIVE DATE (the "TERM"), the
23               following marketing, sales and distribution licenses and rights:
                     (i) the exclusive license and right (exclusive even as to
24               STABAR, except to the extent of the rights reserved to
                 STABAR in paragraphs 1(b), (c), (d) and (e) below) to practice
25               the  PATENT  and  use  STABAR's  CONFIDENTIAL
                 INFORMATION (as defined in paragraph 15 below) and any
26               intellectual property rights attendant thereto (collectively, the
                 "LICENSED  TECHNOLOGY"),  in  connection  with
27               FARNAM's manufacturing, marketing, sales and distribution
                 activities for the ORIGINAL PRODUCTS . . . within/ for the

28

1    continents of North America and Europe (hereinafter the
     "TERRITORY").
2           (ii) the exclusive license and right (exclusive even as to
     STABAR, except to the extent of the rights reserved to
3    STABAR in paragraphs 1(b), (c) and (d) below) to manufacture,
     market, sell and/or distribute the ORIGINAL PRODUCTS in
4    and through the CHANNELS within/ for the TERRITORY.

5    (Stabar Motion SOF Ex. 1 at 3. (boldface omitted).)  As consideration Farnam paid Stabar

6    $1,000,000 up-front and agreed to "use its best efforts to expand" sales of Stabar's Original

7    Products, which included the Stop-Shed line.  Farnam also agreed to spend $1.25 million

8    during the first year of the License Agreement on advertising and promotion of the products.

9    (Farnam Motion SOF at ¶ 25.)

10         Within three weeks of executing these agreements the parties found themselves in

11   disagreement over whether the License Agreement required Stabar to disclose the formula

12   to Farnam.  (Farnam Motion SOF Ex. 27 at FAR007551.)  Consistent with keeping the

13   formula a secret from Farnam, Stabar required Farnam to purchase the product base for the

14   Shed-Stop line — which was made using the formula — from a third-party supplier called

15   Lucas Meyer.  (Stabar Motion at 6.)  The product base constituted 99% of many of the final

16   products in the Shed-Stop line.  (Farnam Motion SOF Ex. 28 at 1.)

17         Despite the dispute over the formula, Farnam continued performance on the contract.

18   (Farnam Motion SOF at ¶ 40.)  Considering that Farnam would have to outsource from Lucas

19   Meyer 99% of the content of the final Shed-Stop products, though, Farnam determined that

20   its original plan to bring the manufacturing process in-house was unworkable.  (Farnam

21   CSOF at ¶¶ 31, 33.)  Instead, Farnam relied on Todd's Ltd., Stabar's contract manufacturer,

22   to handle the remaining steps of production, including the addition of a mixture of oils,

23   blending the product, bottling and labeling.  (Farnam CSOF at ¶ 30; Farnam Motion SOF Ex.

24   30 at 10:12-23.)

25         In October of 2000, Farnam advised Stabar that Farnam would not meet its $1.25

26   million advertising and promotion spending requirement under the License Agreement.

27   (Farnam Motion SOF at ¶ 43.)  Stabar terminated the agreement roughly two years later on

28   November 24, 2002, based on Farnam's alleged breaches.  (doc. # 46 at ¶ 34.)

1    Farnam brought this action in the Superior Court of Arizona on February 2, 2003,

2   seeking a declaration of non-breach and damages for Stabar's alleged breach of contract,

3   trade disparagement and conversion.  (doc. # 1 at 5-8.)  Stabar removed the action to this

4   court on March 13, 2003 (doc. # 1), and counterclaimed for breach of contract, fraudulent

5   misrepresentation, negligent misrepresentation, violation of A.R.S. §§ 44-1521 and 44-401,

6   tortious interference with contract, unfair competition, misappropriation, and patent and trade

7   dress infringement.

8    Farnam now moves for summary judgment on its claims for declaratory relief and

9   breach of contract and on Stabar's counterclaims for breach of contract, breach of the

10   Confidentiality Agreement, tortious interference, and violations of A.R.S. §§ 44-1521 and

11   44-401.  Stabar does not oppose Farnam's motion with respect to its counterclaims of tortious

12   interference, breach of the Confidentiality Agreement, and violation of A.R.S. §§ 44-1521

13   and 44-401.  Stabar, for its part, now moves for summary judgment on Farnam's claims of

14   breach of contract and trade disparagement and Farnam's counterclaim defenses of

15   misrepresentation, waiver, estoppel, laches and statutes of limitations.  Farnam does not

16   oppose Stabar's motion with respect to its trade disparagement claim.

17   **II.    Summary Judgment Standard**

18    Summary judgment will be granted if the evidence shows that there is no genuine

19   issue of material fact and that the moving party is entitled to judgment as a matter of law.

20   Fed. R. Civ. P. 56(c).  To defeat a motion for summary judgment, the nonmoving party must

21   show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

22   242, 250 (1986).  A material fact is one that might affect the outcome of the suit under the

23   governing law.  *Id*. at 248.  A factual issue is genuine "if the evidence is such that a

24   reasonable jury could return a verdict for the nonmoving party." *Id*.  In considering a

25   summary judgment motion the Court views the facts in the light most favorable to the

26   nonmoving party and draws any reasonable inferences in the nonmoving party's favor.

27   *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995).  However, the party opposing

28   summary judgment "may not rest upon the mere allegations or denials of [the party's]

1   pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."

2   Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

3   574, 586-87 (1986).  The Court determines whether there is a genuine issue for trial but does

4   not weigh the evidence or determine the truth of the matters asserted.  *Jesinger v. Nev. Fed.*

5   *Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994).

6   **III.   Breach Of Contract**

7        The court is asked to resolve disputes over interpretation of the License Agreement

8   and Confidentiality Agreement.  Both parties allege that the other party breached first,

9   making permissible that party's later conduct.  The paramount issue in the case is whether the

10  License Agreement required Stabar to disclose the formula to Farnam.  Other alleged

11  breaches of the License Agreement now before the court involve (1) Stabar's alleged

12  interference with Farnam's exclusive right to market to mass market accounts, (2) Stabar's

13  allegedly inadequate disclosure under the License Agreement's "salability" clause, and (3)

14  Stabar's alleged breach of the covenant of good faith and fair dealing.

15       **A.   Role Of The Court**

16        The License Agreement is governed by Arizona law.  (Farnam Motion SOF Ex. 1 at

17  25 at ¶ 24.)  "Generally, and in Arizona, a court will attempt to enforce a contract according

18  to the parties' intent."  *Taylor v. State Farm Mutual Auto. Ins. Co.*, 175 Ariz. 148, 152, 854

19  P.2d 1134, 1138 (1993) (citations omitted).  The parties' intent is "a question of law for the

20  court where the terms of a contract are found to be plain and unambiguous." *Chandler Med.*

21  *Bldg. Partners v. Chandler Dental Group*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (App.

22  1993).  If a contract is ambiguous, on the other hand, "the parties may offer evidence to help

23  interpret it, in which case construction is a question for the jury."  *Hall Family Props., Ltd.*

24  *v. Gosnell Dev. Corp.*, 185 Ariz. 382, 389, 916 P.2d 1098, 1104 (App. 1996) (citations

25  omitted).

26        "Language in a contract is ambiguous only when it can reasonably be construed to

27  have more than one meaning."  *In re Estate of Lamparella*, 210 Ariz. 246, 109 P.3d 959, 963

28  (2005) (citations omitted).   The court thus applies a "standard of reasonableness" in

determining whether language is susceptible to more than one interpretation.  *Gesina v. General Elec. Co.*, 162 Ariz. 39, 45, 780 P.2d 1380, 1386 (App. 1988).  In making the determination, the judge may look to extrinsic evidence: "the judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties."  *Taylor*, 175 Ariz. at 154, 854 P.2d at 1140.

### B.    Alleged Breach Regarding The Formula

#### 1.    Effect Of The Confidentiality Agreement

Paragraph 15 of the License Agreement reads:  "Nothing herein shall be deemed to limit or alter the rights and obligations of FARNAM and/or STABAR under the CONFIDENTIALITY AGREEMENT."  (Stabar Motion SOF Ex. 1 at 22.)  As between the License Agreement and the Confidentiality Agreement, this language unambiguously makes the Confidentiality Agreement preeminent.  Because rights and obligations established under the Confidentiality Agreement cannot be modified by the court's interpretation of the License Agreement, the court addresses the Confidentiality Agreement first.

The Confidentiality Agreement defines Stabar's "Confidential Information" very broadly, and the formula is specifically included in the definition:

> a.    STABAR'S CONFIDENTIAL INFORMATION means all data, formulae, processes, procedures, methods, documentation, information, records, drawings, designs, specifications, test results, evaluations, know how, material directly related to tests or assays, business assets, client and supplier lists, products, processes, or prospects that is [sic] proprietary and confidential in nature related to the ORIGINAL PRODUCTS (as defined by the LICENSING AGREEMENT) or to STABAR, communicated to, supplied to, or observed by FARNAM directly or indirectly, at any time, either orally, by demonstration or in any tangible form, including, but not limited to a writing, drawing or electronic media.    STABAR'S CONFIDENTIAL INFORMATION *specifically includes without limitation the suppliers, ingredients and formula* for the ORIGINAL PRODUCTS.

(Stabar Motion SOF Ex. 1 at Ex. G at 2 (emphasis added).)  Stabar, however, only agreed in the Confidentiality Agreement to disclose to Farnam some unidentified portion of its

"confidential information." Both the Recitals and Agreements sections of the Confidentiality

Agreement refer only to disclosure of "some" confidential information:

### RECITALS
. . .
F.      Each party hereto is willing, subject to the terms and conditions hereof, to disclose some of its CONFIDENTIAL INFORMATION to the other party for the purpose of FARNAM and STABAR and ALLEN performing their respective duties and obligations under the business relationships between them (the "PURPOSE").
. . .

### AGREEMENTS
. . .
2.      ALLEN, STABAR and FARNAM each agree to disclose . . . some of their respective CONFIDENTIAL INFORMATION . . . to the other(s) . . . ."

(Stabar Motion SOF Ex. 1 at Ex. G at 1.)

Stabar argues that these two provisions in the Confidentiality Agreement expressly

reserve for Stabar the right to withhold some of its confidential information. (Stabar Motion

at 7-8.) Words of a contract, however, are generally given their ordinary meaning. *Burke*

*v. Voicestream Wireless Corp.*, 207 Ariz. 393, 396, 87 P.3d 81, 84 (App. 2004). These

provisions only speak of disclosure; they do not speak one way or the other about the

undisclosed information and thus cannot be said to expressly create any right to withhold

information. An obligation that Stabar disclose certain specific information to Farnam could

hypothetically predate the Confidentiality Agreement, for example, without being nullified

or contradicted by these provisions. The right to withhold confidential information,

moreover, pre-existed the agreement, given that no obligation generally exists to disclose

one's confidential information to others. The right to withhold information therefore cannot

appropriately be considered as within the Confidentiality Agreement's express scope.

The Confidentiality Agreement is also not really a contract about information to be

disclosed or withheld, and Stabar's insulated focus on this collateral term obscures

understanding of its context. The court should examine the words of a contract in the context

of the contract as a whole. *Climate Control v. Hill*, 86 Ariz. 180, 188, 342 P.2d 854, 859

(1959); *United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 259, 681 P.2d 390, 411 (App.

1983).  The Confidentiality Agreement is geared predominantly toward assuring that the parties protect confidential information obtained from other parties in the course of their business interactions.  It includes warranties that the parties will properly mark and store documents containing confidential information, that the parties will not commercially exploit the other parties or use their confidential information for illicit purposes, and that the parties' employees will pledge not to divulge or misuse such information.  The only part of the Confidentiality Agreement that deals with disclosure between the parties is the part seized upon by Stabar.  In short, Stabar overemphasizes the importance of this indefinite and generally noncommittal disclosure clause in an agreement otherwise focused on protecting secrets once unveiled.

Although a theory of implied promise in the Confidentiality Agreement seems remotely plausible, Stabar has rested its argument solely on the theory that the Confidentiality Agreement expressly provided the parties a right to withhold some of their confidential information.  The court allows the parties to control and define the theory of their case and addresses only the arguments made, *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 571 n.30 (1990), especially since it seems that Stabar has deliberately chosen to maintain a consistent opposition to implied covenants throughout these motions.  As such, the Confidentiality Agreement creates no right or obligation preventing the construction of the License Agreement as requiring disclosure of the formula.

### 2.   Provisions Of The License Agreement Relevant To The Alleged Breach Based On The Formula

The License Agreement does not explicitly state that Stabar shall or shall not disclose the formula to Farnam.  Farnam obtained the exclusive rights (1) to use Stabar's confidential information — including the formula — and any intellectual property rights attendant thereto, (2) to practice Stabar's patent based on the formula, and (3) to manufacture Stabar's products.  Farnam and Stabar dispute whether these provisions were intended to require disclosure of the formula by Stabar.

Both parties have offered extrinsic evidence in support of their asserted interpretations. If after looking at the evidence, the judge "finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Taylor*, 175 Ariz. at 154, 854 P.2d at 1140. The court concludes that the License Agreement is reasonably susceptible to either interpretation and that the parol evidence rule does not bar the extrinsic evidence.

### i. The License Agreement Is Reasonably Susceptible To Stabar's Interpretation Of The Three Clauses

Stabar's interpretation of these provisions as not requiring disclosure of the formula has a logic to it. First, the right to "use" confidential information is distinguishable from the right to "know" or to "be informed" of that information, and a right to "use" need not be premised on a right to "know." Cell phone users may not, for instance, have the right to demand disclosure about the technology in their phones (although customer-friendly representatives may attend to such demands), and they certainly do not need to know or understand the technology in order to use the phone.

These agreements, moreover, distinguished between "disclosure" and "use" of confidential information. Where multiple contracts are part of the same transaction, they are understood and read together. *Pima Farms Co. v. McDonald*, 30 Ariz. 82, 88, 244 P. 1022, 1024 (1926); *Ariz. Land Title & Trust Co. v. Safeway Stores*, 6 Ariz.App. 52, 58-59, 429 P.2d 686, 692-93, (App. 1967). Here, the Confidentiality Agreement and License Agreement — executed on the same day in the same transaction and containing overlapping terminology — explicitly dealt with disclosure of confidential information in one section and use of confidential information in another. It would be reasonable to assume that each provision retained its own instrinsic purpose. *Cf. Chandler Med. Bldg. Partners v. Chandler Dental Group*, 175 Ariz. 273, 277, 855 P.2d 787, 791 (App. 1993) ("[T]he court will not construe one provision in a contract so as to render another provision meaningless."). The parties' recitals can also be important indicia of intent, *State ex. rel. Goddard v. R.J. Reynolds Tobacco Co*, 206 Ariz. 117, 120, 75 P.3d 1075, 1078 (App. 2003), and one of the recitals in

1    the Confidentiality Agreement arguably captured exactly how much disclosure these parties

2    wished to assent to.  That recital stated: "Each party hereto is willing, subject to the terms and

3    conditions hereof, to disclose some of its CONFIDENTIAL INFORMATION to the other

4    party . . . ."  (Farnam Motion SOF Ex. 1 at 1 at ¶ F.)  Stabar could reasonably understand the

5    rest of their agreement to respect this limited willingness to disclose.

6         Second, the right to "practice the patent" need not suggest disclosure of information

7    beyond that already disclosed in the patent.  Parties could reasonably believe that information

8    protected by the patent owner during the patent application process would remain privileged

9    in any granted license to practice that patent.  A patent license generally provides the licensee

10   "not a property interest in the patent, but rather the right to immunity from suit for

11   infringement by the licensor." *Transitron Elec. Corp. v. Hughes Aircraft Co.*, 649 F.2d 871,

12   875 n.7 (1st Cir. 1981).  The "practice the patent" provision need not have required more in

13   this case.

14        Finally, the word "manufacture" may reasonably refer to all of the blending,

15   packaging and labeling processes that Farnam was entitled to do after obtaining the product

16   base from Lucas Meyer.  Various Arizona statutes define "manufacture" to include

17   assembling, mixing, blending, packaging and labeling.  *See, e.g.*, A.R.S. § 3-262

18   ("'Manufacture' means to compound, produce, granulate, mix, blend or alter the composition

19   . . . ."); A.R.S. § 13-3451 ("'Manufacture' means the production, preparation . . . packaging

20   or repackaging, or labeling or relabeling . . . ."); A.R.S. § 13-3401 ("'Manufacture' means

21   produce, prepare, propagate, compound, mix or process . . . [and] includes any packaging or

22   repackaging or labeling or relabeling of containers.").  In any event, the language of the

23   contract and Farnam's strength as a marketer support the proposition that the "manufacturing"

24   to be done was end-stage in nature.

25        The language of the License Agreement supports an understanding that manufacturing

26   rights were not central to the parties' intent and that Farnam was more interested in the

27   trademark and end-stage distribution.  The AGREEMENTS section of the license, for

28   example, refers to the rights conveyed as "the following marketing, sales and distribution

licenses and rights." (Farnam Motion SOF Ex. 1 at 3 at ¶ 1(a).) The License Agreement's recitals similarly refer only to marketing, selling, and distribution rights, without mentioning Farnam's intent to manufacture Stabar's products. (*See* Farnam Motion SOF Ex. 1 at 1-2.)

Farnam's marketing strength also supports the reasonableness of understanding the conveyed manufacturing rights as end-stage in nature. As Farnam's Charles Duff related, "Farnam's key strength is marketing. It's well-known in the industry that we're excellent marketers, and that's what we were referring to as our ability to advertise and promote products, introduce new products." (Stabar Response SOF Ex. 1 at 71:21-25.) The parties may have understood Farnam's rights in light of Farnam's strength.

### ii. The License Agreement Is Reasonably Susceptible To Farnam's Interpretation Of The Three Clauses

At the same time, Farnam's understanding that these provisions meant it would obtain the formula is reasonable. Farnam's rights under the License Agreement were exclusive, in large part even as to Stabar. (Farnam Motion SOF Ex. 1 at 3.) Farnam had the exclusive right to use Stabar's confidential information, a right exclusive even as to Stabar, and Stabar's confidential information specifically included the formula. To posit a third party using Stabar's formula in making the product base, for example, or a third party using it for any purpose at all, is directly inconsistent with Farnam's purportedly exclusive right to use Stabar's confidential information.

The License Agreement also expressly conveyed to Farnam the exclusive right to use any intellectual property rights attendant to Stabar's confidential information. It is hard to see how the parties expected Farnam to "use" this trade secret — which was nothing but a chemical formula — without having access to it.

Similarly, the License Agreement required Farnam to manufacture the Shed-Stop line, while at the same time granting Farnam the exclusive right to do so. (Farnam Motion SOF Ex. 1 at 8 at ¶ 4.) The combination reasonably suggests that Farnam would be able to fulfill its obligation without the help of any third party.

Nor would it be completely unreasonable for a party to understand "practicing the patent" as practicing the inventor's methodology, which in this case was the formula. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002) (noting that patent applications "must describe, enable, and set forth the best mode of carrying out the invention"). Farnam obtained the exclusive right to manufacture Shed-Stop products, and Shed-Stop product labels read "Patented Formula!" (Farnam CSOF Ex. 10.) The parties reasonably could have understood that such language meant to convey any formula Stabar might have that was necessary for manufacturing.

### 3. Whether A Reasonable Jury Considering The Evidence Could Find For The Non-Moving Party

Given that neither parties' understanding of the agreements is unreasonable, the evidence offered by them is admissible to determine the meaning of the contract. *Taylor*, 175 Ariz. at 154, 854 P.2d at 1140. Genuine disputes of material fact must be resolved by a fact-finder:

> Even in the case of a final, written contract, the meaning of the words may depend upon various surrounding circumstances that are in dispute. The circumstances must be found as a fact before interpretation can proceed. . . . [A] special verdict may be possible but may not be regarded as practicable, and the whole undivided problem may be left to the jury.

5 CORBIN § 24.30, at 337 (1998); *see also Hall Family Props., Ltd. v. Gosnell Dev. Corp.*, 185 Ariz. 382, 389, 916 P.2d 1098, 1104 (App. 1996) ("If a contract is ambiguous, the parties may offer evidence to help interpret it, in which case construction is a question for the jury"). Here, Stabar has requested a jury trial. (doc. # 46.)

### i. Farnam's Motion

A jury could reasonably find that the parties' intent was not to require disclosure of the formula by Stabar. Stabar presents evidence that Farnam was informed during negotiations that Stabar would refuse to disclose the formula unless Farnam purchased Stabar's corporation outright. (Stabar Motion SOF Ex. 8 at 115:1-3.) More precisely, Stacy Allen of Stabar testified to having explained this point to Farnam's consultant, Robert Fountain. (*Id.*) Her testimony is arguably corroborated by Fountain, who testified, "I believe

1   they said that if it's just a licensing deal, that they would be reluctant to release the formula."

2   (Stabar Motion SOF Ex. 7 at 45:4-6.)  More corroboration comes from Farnam's own counsel

3   for the negotiations, who acknowledged that an email appeared to support the proposition

4   that Farnam knew Stabar did not intend to release the formula.  (Stabar Motion SOF Ex. 2

5   at 160:22-25 ("Q: So apparently, Farnam knew that this was Stabar's position, right?  A:

6   From this e-mail, that seems apparent.").)  At a minimum, the fact-finder could determine

7   that Farnam had objective cause to doubt Stabar's acquiescence on the issue.  In such

8   circumstances, the lack of a clear text entitling Farnam to the formula may leave Stabar's

9   communicated understanding controlling.  *See Hill-Shafer Partnership v. Chilson Family*

10  *Trust*, 165 Ariz. 469, 799 P.2d 810, (1990) ("The manifestations of the parties are operative

11  in accordance with the meaning attached to them by one of the parties if . . . that party has

12  no reason to know of any different meaning attached to the other, and the other has reason

13  to know the meaning attached by the first party.") (citing Restatement (Second) of Contracts

14  § 20 (1979)).  Allocating this burden to Farnam may be especially appropriate given that

15  Farnam prepared at least the initial draft of the License Agreement.  *See Andrews v. Blake*,

16  205 Ariz. 236, 242, 69 P.3d 7, 13 (2003) ("A contract is to be construed most strongly against

17  the party who prepared it." (citations and alterations omitted)).  The court therefore denies

18  Farnam's motion for summary judgment.

19                          **ii.    Stabar's Motion**

20          A jury could reasonably disbelieve Stabar's witnesses and find that the parties' intent

21  was to require disclosure of the formula by Stabar.  Farnam has submitted testimonial

22  evidence that it's personnel believed the contract would require disclosure of the formula,

23  (Farnam CSOF at ¶ 27), and more importantly, that Stabar was on notice of Farnam's need

24  for "disclosure of specifications and formulations" in the agreement.  (Farnam CSOF Ex. 6

25  at 21:12-15.)  Farnam also submitted evidence that key personnel from Farnam do not

26  remember anyone from Stabar making the assertion that Stabar would not release the

27  formula.  (Farnam CSOF Ex. 6 at 126: 5-13.)  Finally, Farnam has submitted expert

28  testimony that licensors under such royalty-bearing trade secret licenses typically disclose

the trade secret.  (CSOF at ¶ 6.)  The court therefore denies Stabar's motion for summary

judgment.

### 4.   There Is No Implied-In-Law Covenant Requiring Disclosure

Farnam alternatively argues that the License Agreement should be construed by the

court to include an implied-in-law promise by Stabar to disclose to Farnam the formula.

Arizona law, however, generally disfavors implied covenants.  *Walgreen Ariz. Drug Co. v.*

*Plaza Ctr. Corp.*, 132 Ariz. 512, 515, 647 P.2d 643, 646 (App. 1982).

> This persona non grata status [of implied covenants] is based
> primarily on the presumption that when parties have entered into
> written agreements which embody the obligations of each, they
> have expressed all of the conditions by which they intend to be
> bound and courts should be reluctant to enlarge, by implication,
> on those conditions which affect important matters.

*Id.* (citations omitted).  An implied covenant "can be justified only upon the ground of legal

necessity arising from the terms of a contract or the substance thereof."  *Smith v. Phlegar*,

73 Ariz. 11, 18, 236 P.2d 749, 754 (1951).  "It is not enough to say that it is necessary to

make the contract fair, that it ought to have contained a stipulation which is not found in it,

or that without such a covenant it would be improvident, unwise, or operate unjustly."

*Walgreen Ariz. Drug Co.*, 132 Ariz. at 515, 647 P.2d at 646 (citations omitted).  Because of–

> the reluctance of courts to tamper with parties' written contacts,
> certain conditions have been imposed before a court will imply
> a covenant. These conditions have been summarized as: (1) The
> implication must arise from the language used; (2) it must
> appear from the language used that it was so clearly within the
> contemplation of the parties that they deemed it unnecessary to
> express it; (3) implied covenants can only be justified on the
> grounds of legal necessity; (4) a promise can be implied only
> where it can be rightfully assumed that it would have been made
> if attention had been called to it; (5) there can be no implied
> covenant where the subject is completely covered by the
> contract.

*Id.* (citations and alterations omitted).

Farnam provides no Arizona authority in support of its assertion that the License

Agreement contained an implied-in-law covenant and does not explain how the conditions

outlined in *Walgreen* are satisfied.  Farnam has not demonstrated, for instance, that an

implied-in-law covenant is legally necessary here.  "[C]ourts will imply terms *only* where

1    necessary to effectuate the parties' apparent intent." *Triangle Mining Co. v. Stauffer Chem.*

2    *Co.*, 753 F.2d 734, 739 (9th Cir. 1985) (citing *Walgreen Ariz. Drug Co. v. Plaza Ctr. Corp.*,

3    132 Ariz. 512, 647 P.2d 643, 646 (App. 1982)).  The question of the parties' intent here as

4    of yet requires factual resolution, and a preemptive judicial fiat on that issue would be

5    inappropriate.  *See Golder v. Crain*, 7 Ariz.App. 207, 437 P.2d 959, (App. 1968) (holding

6    that contract was "sufficiently ambiguous so that a trial court must look at the circumstances

7    surrounding the inception of this contract before giving it construction").   Necessity,

8    moreover, is absent; the parties' maintained their relationship for an extended period of time

9    after their first-year disputes over the formula and over Farnam's failure to meet its $ 1.25

10   million advertising and promotion expenditure requirement.   In the second year of the

11   License Agreement, Farnam spent $ 2.1 million on advertising and promotion of Stabar's

12   products.  (Farnam Motion SOF at ¶ 58.)  The continued relationship and effort by Farnam

13   suggest to the court that "[t]he contract has a business efficacy without adding this

14   unexpressed term to it." *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1345 (Fed. Cir.

15   2001).

16         **C.**    **Alleged Breach Regarding Mass Market Account**

17         Stabar moves for summary judgment on Farnam's claim and defense that Stabar

18   allegedly interfered with Farnam's exclusive marketing rights under the License Agreement.

19   The License Agreement granted to Farnam a right of first refusal with respect to marketing

20   to mass market accounts, as follows:

> For the TERM, FARNAM shall have a first right of refusal with respect to any MASS MARKET ACCOUNTS which STABAR desires to contact for the purpose of negotiating the manufacture, marketing, sale and distribution of the PRODUCTS.  STABAR shall provide FARNAM with written notice of STABAR's plans to engage in negotiations with any MASS MARKET ACCOUNTS, and FARNAM shall have a period of fifteen (15) business days following the date of FARNAM's receipt of such notice within which to exercise its right to commence negotiations with such MASS MARKET ACCOUNTS.  For purposes of this AGREEMENT, "MASS MARKET ACCOUNTS" shall mean those discount stores generally acknowledged in the pet industry to serve the mass market (e.g., K-Mart, Walmart, Bradles, etc.).

1  (Farnam Motion SOF Ex. 1 at 4 at ¶ 1(c).)  Farnam alleges that Stabar violated this provision

2  by marketing to K-Mart without providing Farnam the required notice.  (Farnam Response

3  at 14.)

4        Stabar argues that Farnam cannot show damages arising from this breach, given that

5  Stabar's alleged breach actually profited Farnam.  The party opposing summary judgment

6  "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set

7  forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see*

8  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

9  Farnam provides no evidence from which a fact-finder could conclude that Farnam has

10  suffered damages arising from Stabar's alleged breach or, alternately, provided authority that

11  such harm is not a necessary part of Farnam's claim.  The court therefore grants Stabar's

12  motion for summary judgment against Farnam's claim for affirmative recovery for breach of

13  the mass marketing clause.  The parties have not addressed whether the absence of damages

14  affects the legal significance of this breach if used by Farnam as a defense.  Therefore, the

15  court only grants Stabar's motion for summary judgement with respect to Farnam's claim for

16  affirmative recovery based on this breach.

17        **D.    Alleged Breach Regarding "Salability" Clause**

18        Stabar moves for summary judgment on Farnam's claim and defense related to the

19  License Agreement's "salability" clause, which provided:

20        (h) To STABAR'S knowledge, all information relating to the
ORIGINAL PRODUCTS provided to FARNAM by STABAR
21        in verbal or written form is truthful and accurate. *No significant
facts which may relate to the salability of the ORIGINAL*
22        *PRODUCTS have been knowingly withheld or omitted by
STABAR.*
23        . . .
            FARNAM's performance under this AGREEMENT shall
24        be conditioned upon the accuracy and completeness of each and
every of these representations and warranties, the inaccuracy or
25        incompleteness of which shall be a material breach of this
AGREEMENT . . . .
26

27  (Farnam Motion SOF Ex. 1 at 18 at ¶ 10 (emphasis added).)  In the Complaint Farnam

28  alleged that Stabar failed to disclose that many of Stabar's Original Products were nothing

1   more than concepts at the time of the License Agreement's execution.  According to Farnam,

2   the fact that many of the products were merely concepts that were untested and unmarketed

3   directly affected their salability, and Stabar's omission of that fact was therefore a material

4   breach of the License Agreement.  Stabar now moves for summary judgment, arguing that

5   a product's stage of development is different from salability.  (Stabar Reply at 9.)

6   "Salability," Stabar argues, relates only to the products' ultimate appeal to consumers.

7   (Stabar Reply at 10.)

8        Neither party has offered parol evidence as to what the parties intended by the word

9   "salability" in the License Agreement.  The word is not a term of art, and Stabar has not

10  provided the court with evidence or argument that would permit finding that the parties

11  intended as a matter of law to limit the meaning of "salability" to the effect of the products

12  on customers.

13       In summary, the court concludes that both interpretations of the word are reasonable

14  in the abstract.  Whether the term has the effect of a warranty of full product development,

15  as Farnam argues, will turn on the commercial and negotiation contexts, which cannot be

16  determined on summary judgment.  For example, if Farnam knew in the course of

17  negotiations that some of the Original Products were not yet at the retail marketing stage, the

18  "salability" clause could not reasonably be a warranty otherwise.  On the other hand, if

19  Stabar concealed the state of development of some of the Original Products, the word might

20  more fairly have that meaning.  The parties' course of negotiations could shed other shades

21  of light on this question.

22       Having concluded that the "salability" clause requires context for interpretation, the

23  court turns to Stabar's other rationales supporting its motion for summary judgment.  Stabar

24  argues that Farnam fails to present evidence creating a triable issue as to (1) whether the

25  products were merely conceptual and not fully developed and (2) whether Farnam was

26  injured by Stabar's alleged breach.  (Stabar Motion at 18-19.)

27       Farnam submits evidence creating a triable issue of fact as to whether many of the

28  products were merely conceptual or not fully developed.  An annual sales list for Stabar

1   products in 1999 shows that there were no sales for many of Stabar's listed Original Products,

2   including the conditioning brush, massaging comb, halter, leash, lead, collar, Equine

3   Proforma and Equine Shampoo. (*See* Farnam Motion SOF Ex. 1 at Ex. A; Stabar Motion

4   SOF Ex. 15 at FAR008272.) The same list shows that gross sales for many of the products

5   was less than $200. (*Id.*) Finally, Farnam presents evidence that the Pet's n' People Snacks

6   were nothing more than human cookies purchased at Wal-Mart or a grocery store and

7   repackaged. (Farnam CSOF Ex. 9 at 222:23- 224:9.) Stabar's knowing failure to disclose

8   these facts could constitute a breach.

9       Stabar's argument that "many" of the products had been developed and manufactured

10  misses the point. Stabar had a duty to knowingly withhold "no" significant facts. That some

11  products were imaginary, even if others were well-established, could be a significant fact.

12      Farnam also submits evidence sufficient to create a triable issue at to whether Farnam

13  was harmed by Stabar's alleged breach. Chuck Duff testified that because the products

14  existed only as concepts, it took Farnam a long time to get the products into a state in which

15  they could be sold and that a tremendous amount of work was required by Farnam's market

16  research and new-product development departments. (Farnam Motion SOF Ex. 26 at 201:4-

17  203:24.) The market research work is corroborated by Barry Harrison. (Farnam Motion

18  SOF Ex. 23 at 64:17-65:5.) The extra expenses involved are Farnam's harm from the breach.

19      Stabar argues that Farnam was not harmed by the alleged breach because Farnam's

20  interest in the Original Products was only to control the trademark. Even the evidence Stabar

21  relies on is contrary. The testimony of Duff relied on by Stabar was that controlling the

22  trademark was Farnam's "primary" interest. (Stabar Motion at 19.) Stabar has cited no

23  authority suggesting that Arizona contract law only protects the expectation interest

24  associated with parties' primary or principle interest in an agreement.

25      **E.    Alleged Breach Regarding Covenant Of Good Faith And Fair Dealing**

26      Both parties move for summary judgment on Farnam's claim of breach of the covenant

27  of good faith and fair dealing. The covenant of good faith and fair dealing "requires that

28  neither party act to impair the right of the other to receive the benefits that flow from their

1   agreement or contractual relationship." *Kuehn v. Stanley*, 208 Ariz. 124, 132, 91 P.3d 346,

2   354 (App. 2004) (citations omitted).  Here, Farnam claims that Stabar breached the covenant

3   of good faith and fair dealing by failing to disclose the formula to Farnam.  (Farnam

4   Response at 16; Farnam Motion at 10-12.)  Lack of the formula, Farnam maintains, impairs

5   Farnam from benefitting from its exclusive right to manufacture Shed-Stop.  (*See* Farnam

6   Motion at 10.)

7          Farnam's good faith and fair dealing claim inherently depends on resolution of the

8   factual issues related to disclosure of the formula.  If the License Agreement imposed on

9   Stabar a duty to disclose the formula, then Stabar's refusal to provide the formula would be

10  a direct breach of contract.  If, on the other hand, the License Agreement gave Stabar the

11  right to withhold the formula, then the covenant of good faith and fair dealing could not itself

12  supply a new substantive right.  *See Kuehn*, 208 Ariz. at 132, 91 P.3d at 354 ("As a general

13  rule, an implied covenant of good faith and fair dealing cannot directly contradict an express

14  contract term.").  Since the only application of the implied covenant addressed in these

15  motions is as an alternative source of a duty to disclose the formula, Stabar's motion for

16  summary judgment will be granted against that contention and Farnam's motion will be

17  denied.

18  **IV.     Farnam's Counterclaim Defenses**

19         Stabar additionally moves for summary judgment with respect to various affirmative

20  defenses alleged by Farnam in Farnam's pleadings.  (*See* doc. # 47.)  The court addresses the

21  affirmative defenses challenged by Stabar in four categories: (1) misrepresentation, (2)

22  waiver and laches, (3) estoppel, and (4) statutes of limitation.

23                **A.     Misrepresentation, Fraud, And Unclean Hands**

24         Stabar moves for summary judgment as to Farnam's affirmative defenses of fraud,

25  unclean hands, fraudulent inducement and misrepresentation.  Stabar alleges that these

26  affirmative defenses have not been plead with particularity as required by Federal Rule of

27  Civil Procedure 9(b).  Section 9(b) provides: "In all averments of fraud or mistake, the

28  circumstances constituting fraud or mistake shall be stated with particularity."  Farnam has

not challenged Stabar's motion.  In any event, Farnam's pleading is boilerplate and fails to meet the particularity requirement of Rule 9(b).  (*See* doc. # 47 at 18.)  The court therefore grants Stabar's motion.

### B.     Waiver And Laches

Stabar moves for summary judgement with respect to Farnam's affirmative defenses of waiver and laches.  Neither party has analyzed the facts submitted by Farnam as the basis for these defenses.  Stabar argues that Paragraph 23 of the License Agreement removes from the case any potential defense of waiver or laches.  That paragraph provides:

> <u>Non-Waiver.</u>  Any failure or delay by either party to insist upon strict performance of any provision hereof or to exercise any right, power, privilege, or remedy consequent upon default hereunder shall not constitute a waiver of any provision, right, power, or privilege, or of any available remedy under the AGREEMENT, including any provision the performance of which was not insisted upon and/or any right, power, privilege, and/or remedy which was not exercised.

(Farnam Motion SOF Ex. 1 at 25 at ¶ 23.)  This provision cannot purport to globally exterminate laches or waiver as a defense for any conduct by either party to the transaction.  Rather, the provision must be read to protect rights of the parties under the agreement even though "strict performance" has not been demanded.  Wholesale elimination of party's ability to defend himself using a laches or waiver defense could likely be unconscionable.  *Cf.* Restatement (Second) of Contracts § 208 Il. 4 (contractual time limit for bringing claims may be unconscionable as applied).  In any event, Stabar's failure to discuss the waiver and laches facts given by Farnam in its response makes it inappropriate to grant summary judgment with respect to those facts.  Stabar's motion is therefore denied.

### C.     Estoppel

Stabar moves for summary judgment with respect to Farnam's affirmative defense of estoppel.  Farnam's estoppel defense arises from the following facts:  After Farnam advised Stabar that Farnam would not meet the advertising and promotion expenditure requirement for the first year of the License Agreement, the parties discussed amending the License Agreement to reflect Farnam's actual expenditures.  (Farnam Motion SOF at ¶ 52.)  Farnam

1    forwarded to Stabar on August 6, 2001, a proposal for an amendment to the License

2    Agreement to effectuate such changes.  (Farnam Motion SOF at ¶ 53; Farnam Motion SOF

3    Ex. 44.)  Three months later on November 7, 2001, Stabar notified Farnam that Stabar

4    refused to sign the proposed amendments.  (Farnam Motion SOF at ¶ 56.)  Farnam contends

5    that Farnam relied on the amendment and that, on the basis of these facts, Stabar should be

6    estopped from raising Farnam's failure to meet its $1.25 million expenditure level.

7        Neither party has cited authority on the issue.  On its face, a party's refusal to assent

8    to a contractual modification does not present the type of factual circumstance in which

9    estoppel would be relevant.  *See, e.g.*, *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 59

10   (1984).  Stabar, however, has not specifically challenged or contradicted the theory offered

11   by Farnam, so neither will the court.  *See Arai v. Am. Bryce Ranches Inc.*, 316 F.3d 1066,

12   1070 n.4 (9th Cir. 2003).  Stabar only asserts that Farnam's estoppel argument is barred by

13   the non-waiver clause in Paragraph 23 of the License Agreement.  Because that clause

14   applies to waiver, not estoppel, the court denies Stabar's motion.

15       **D.    Statutes Of Limitations**

16       Stabar moves for summary judgment with respect to Farnam's affirmative defense of

17   statute of limitations.  Farnam clarifies that this affirmative defense relates to Stabar's

18   consumer fraud claim .  (Farnam Response at 17-18.)  However, because Stabar has waived

19   opposition to Farnam's motion for summary judgment on the consumer fraud claim, (Stabar

20   Response at 2 n.1), the consumer fraud claim falls out of the case.  Farnam's articulated

21   statute of limitations defense is therefore moot, and the court grants Stabar's motion.

22       IT IS THEREFORE ORDERED that Farnam's motion for summary judgment (doc.

23   # 155-1) is granted in part and denied in part.  The motion is granted with respect to Stabar's

24   counterclaims of tortious interference, breach of the Confidentiality Agreement, and

25   violations of A.R.S. §§ 44-1521 and 44-401 and denied with respect to Stabar's alleged

26   breaches of contract.

27       IT IS FURTHER ORDERED that Stabar's motion for summary judgment (doc. # 160)

28   is granted in part and denied in part.  The motion is granted as to Farnam's affirmative claims

under the mass marketing clause, the implied covenant of good faith and fair dealing to the extent Farnam argues that the covenant creates a duty to disclose the formula, and Farnam's affirmative defenses of misrepresentation, fraud, unclean hands and statutes of limitations. The motion is denied as to Farnam's other alleged breaches of contract and as to Farnam's affirmative defenses of estoppel, waiver and laches.

DATED this 12th day of December, 2005.

_____
Neil V. Wake
United States District Judge